849 F.2d 974
 Bankr. L. Rep. P 72,348
In the Matter of Dorothy Robinson LENARD, Debtor.
CAREFREE RANCH, INC. and Hugh Allen Coleman, Appellants,
v.
Dorothy Robinson LENARD and Billy Vining, Appellees.
 No. 87-4813.
 United States Court of Appeals,
Fifth Circuit.
 July 21, 1988.
Rehearing Denied Aug. 17, 1988.
 
 Donald J. Anzelmo, Monroe, La., for Carefree Ranch, Inc.
 William H. Baker, Jonesboro, La., for Coleman.
 R. Douglas Wood, Jr., Monroe, La., Michael E. Kramer, Winnsboro, La., for Vining.
 Appeal from the United States District Court for the Western District of Louisiana.
 Before RUBIN, GARZA and JONES, Circuit Judges.
 ALVIN B. RUBIN, Circuit Judge:
 
 
 1
 Representing an unsecured creditor of a bankrupt debtor, the bankruptcy trustee seeks to nullify two transfers of a ranch and to return the property to the debtor's estate to satisfy the creditor's claim. The bankruptcy court, applying Louisiana law, found that (1) the first transfer, from the debtor and her husband to a corporation owned and controlled by their daughter, was a simulation; (2) the second transfer, ostensibly from the corporation to a third party, was therefore in reality from the debtor; and (3) the second transfer consequently increased the debtor's insolvency and could be set aside by means of a revocatory action under the Louisiana Civil Code. The court held, however, that the third-party purchaser in the second sale acted in good faith and so could recover the price he paid for the land. The district court affirmed on all points. We in turn affirm the district court's judgment.
 
 I.
 
 2
 The trustee of the bankruptcy estate of Dorothy Lenard brought this action under 11 U.S.C. Sec. 544(b) on behalf of one of Lenard's unsecured creditors, Tallulah Production Credit Association. Section 544(b) provides in relevant part that "[t]he trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by an unsecured creditor." After a hearing, the bankruptcy court, following Louisiana law as the "applicable law," entered judgment for the trustee.
 
 
 3
 The bankruptcy judge found these facts, which the district court accepted as not clearly erroneous: On August 2, 1983, the Lenards executed an act of sale transferring their 470-acre ranch to Carefree Ranch for the stated price of $15,000 cash. Carefree Ranch is a corporation whose president and sole shareholder is the Lenards' daughter, Paula Michelle Lenard. William and Dorothy Lenard continued to live on the property after the 1983 sale to Carefree. They owed about $89,000 to Tallulah Production Credit Association and had other debts that rendered their financial situation precarious. Two years later, on August 6, 1985, Carefree sold 460 acres of the land to Hugh Coleman for $30,000 cash.
 
 
 4
 Analyzing the first sale, the bankruptcy court found that on August 3, 1983, Dorothy Lenard's father, Lamar Robinson, made out two money orders totalling $15,000 ($7,500 each) to Dorothy or William Lenard. Deposit slips show that these money orders eventually ended up in Carefree's account on August 3 and 5. On August 4, William Lenard made out two checks totalling $15,000 ($7,500 each) to Lamar Robinson. On August 5, Paula Michelle Lenard made out two checks totalling $15,000 ($7,500 each) to William or Dorothy Lenard; these were deposited in the Lenards' account the same day. This series of transactions leaves everyone even but produces a paper trail appearing to show that Paula Michelle paid her parents $15,000 (about $32 an acre) for the land.
 
 
 5
 Paula Michelle Lenard made two different claims concerning how she had obtained the $15,000: first, at her deposition, that she had earned it working at an A & W Root Beer stand between 1974 and 1983 and had kept it in a piggy bank; and second, at the hearing, that she had sold an antique coin collection for that amount to a family friend, James Cook, who also collects coins. The bankruptcy judge found her testimony not credible because these explanations conflicted and because James Cook, at his deposition, could not remember the details of this coin transaction or, indeed, any other coin purchases he had made.
 
 
 6
 Five months after the sale, in January 1984, the Lenards renewed their $89,000 note to Tallulah. In the balance sheet they furnished to Tallulah in connection with this renewal, they listed the 470 acres of land as an asset, valuing it at $625 an acre for a total of $293,750, although the property had ostensibly been sold to Carefree Ranch. Their total net worth at the time was $261,205; thus, apart from the land, they had a negative net worth of $32,545.
 
 
 7
 William Lenard died in March 1985, and Dorothy declared Chapter 7 bankruptcy in June 1985. At a creditors meeting on July 31, at which Paula Michelle Lenard was present, a creditor questioned the validity of the August 1983 sale. Based on this and other indications, the bankruptcy court found, Paula Michelle knew creditors were trying to reach this property and intended to help her mother defraud them. A week after the meeting, on August 6, Carefree, represented by Paula, sold 460 acres of the property to Coleman for $30,000 (about $65 an acre) in a transaction the bankruptcy judge found had been "hastily contracted." This second sale, the judge found, rendered Dorothy Lenard, the debtor, insolvent.
 
 II.
 
 8
 Bankruptcy Rule 8013 provides that a district court hearing an appeal from the bankruptcy court shall not set aside the bankruptcy court's findings of fact unless they are clearly erroneous. Nevertheless, Carefree and Coleman argue, the district court should not have deferred to the bankruptcy court's findings of fact because the judge who entered them had not presided at the hearing, having replaced the judge who had presided, and he therefore lacked the opportunity to observe witnesses personally in judging their credibility.
 
 
 9
 This contention is probably now waived, as Carefree and Coleman did not present it to the district court in their statement of the issues on appeal, but in fact assumed that the court should apply the clearly-erroneous standard. In any event, the contention lacks merit. Like Fed.R.Civ.P. 52(a), Rule 8013 was amended effective August 1, 1987--before the district court ruled on October 6--expressly to shield fact-findings "whether based on oral or documentary evidence." Even before the amendment, Rule 8013 stated unqualifiedly that "[f]indings of fact shall not be set aside unless clearly erroneous" before adding: "and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses."
 
 
 10
 The change in the rule merely clarifies that, as the Supreme Court has stated in the analogous context of district court fact-findings under Rule 52(a),[1] the trial judge's ability to observe witnesses is not, as Carefree and Coleman contend, a necessary condition for application of the clearly-erroneous rule. The deference given to the trial court's fact-findings also conserves judicial resources by avoiding appellate retrials of factual matters.[2]
 
 III.
 
 11
 We turn then to the 1983 sale that the bankruptcy and district courts found void as a "simulation"--a sale "in which the parties do not have genuine intent to transfer or convey property, even though such sale be clothed in concrete form or legal formalities."[3] The plaintiff seeking to prove that a sale was a simulation may, using either direct or circumstantial evidence, create a rebuttable presumption of a simulation in either of two cases: first, under La.Civ.Code article 2480, if the thing sold "remains in the possession of the seller" under usufruct or precarious title; and second, under jurisprudential law, if the "facts and circumstances ... create a highly reasonable doubt as to whether the putative sale is real."[4] In either case, the party to the sale then must establish "a good faith transaction resulting in a true alienation of ownership for consideration."[5] If the party fails, the transaction then is deemed "a sham, and as a result, an absolute nullity": no transfer of ownership occurs.[6]
 
 
 12
 The bankruptcy court found that both the codal and jurisprudential presumptions applied and the defendants had failed to establish that the transaction was in good faith. Some of the evidence on which the court rested these conclusions came from testimony and documents concerning the bank records of Paula Michelle Lenard, Carefree Ranch, Dorothy and William Lenard, and Lamar Robinson. Carefree argues this evidence was inadmissible because (1) the bank produced the records in contravention of Louisiana banking regulations and (2) the trustee failed to lay a proper foundation for introduction of the records. We find no error, however, in the admission of the evidence.
 
 
 13
 A proper foundation was laid for the documents, for the bank officer testifying concerning them had first-hand knowledge of them and identified their source.[7] The only question, then, is whether Louisiana law precluded their admission. Although the Federal Rules of Evidence govern the admissibility of evidence in bankruptcy proceedings,[8] Fed.R.Evid. 501 in turn provides that "with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness [or] person ... shall be determined in accordance with State law."
 
 
 14
 The statute governing disclosure of bank records to a private party, La.Rev.Stat.Ann. Sec. 6:333 A,[9] provides that a bank shall disclose its customer's financial information pursuant to subpoena only if the person or government agency subpoenaing the records certifies to the bank that the customer has been served with the subpoena at least 10 days before his records are to be disclosed. Because it does not appear that the account holders received such notice, or even, perhaps, that a subpoena issued, the bank may have violated the statute in disclosing the records.
 
 
 15
 It does not follow, however, that the court should have refused to admit the records or the testimony based on them. Louisiana statutes specify certain classes of information that are privileged and thereby inadmissible in criminal proceedings[10]--attorney-client, physician-patient, and clergy-penitent communications--but these provisions nowhere mention bank records, let alone a right to suppress them in civil proceedings. In Parish of Jefferson v. Bayou Landing Ltd.,[11] on which Carefree relies, the Louisiana Supreme Court applied the Fourth Amendment exclusionary rule to exclude unconstitutionally seized evidence from admission in a civil obscenity proceeding--a step the United States Supreme Court had already taken--even though no article of the Louisiana Code of Civil Procedure provided for a motion to suppress such evidence. It by no means follows that Louisiana courts would create a new exclusionary remedy for violations of the banking statutes, and Carefree cites no case doing so. In this situation as in others, we decline to "adopt innovative theories of recovery or defense" when construing state law, but "simply ... apply that law as it currently exists."[12]
 
 
 16
 Accepting the evidence as properly admitted, we agree with the district court that the findings of fact of the bankruptcy court are not clearly erroneous. Carefree, noting that even minimal consideration will establish the verity of a transaction,[13] offers an explanation for the circumstances surrounding the 1983 sale: Lamar Robinson loaned the $15,000 to Paula Michelle Lenard but inadvertently made out the money orders to William and Dorothy Lenard, and Paula Michelle repaid the money on selling her coin collection. The bankruptcy court, however, reviewed the evidence and rejected this explanation, finding in particular that Paula's testimony was not credible. Carefree offers no ground for us to reject this determination. Given its findings of fact, the bankruptcy court was correct to conclude that there was serious doubt about the reality of the transaction and that Carefree had not rebutted that doubt.
 
 IV.
 
 17
 The district and bankruptcy courts correctly concluded, therefore, that the 1985 sale to Coleman was in reality from the Lenards, not from Carefree Ranch. As such, that sale exposes the seller, Dorothy Lenard, who was insolvent, to an action to revoke the transaction under Louisiana Civil Code articles 2036-2043. This action, termed the revocatory action, gives a creditor the opportunity to annul a contract made in fraud of his rights[14] if he can show: (1) insolvency of the debtor; (2) injury to the creditor; (3) intent to defraud the creditor by the transaction; and (4) pre-existing and accrued indebtedness.[15]
 
 
 18
 Carefree and Coleman challenge only the existence of the third of these elements, intent to defraud, arguing that neither Paula nor Coleman was aware before the sale that the Lenards' creditors were seeking to regain the property. The bankruptcy court found that while Coleman entered the transaction in good faith, Paula Michelle was "more than likely aware" that Tallulah Production Credit Association had been trying to annul the 1983 sale. This was sufficient to warrant a finding of intent to defraud; and the bankruptcy court's finding is, as the district court concluded, supported by the record. Paula had attended the July 31 meeting at which her mother's creditors had raised questions about the property; a week later, she sold the property hastily at far below its market value and, the record shows, deposited the $30,000 proceeds in a Texas bank she had never before used.
 
 
 19
 Finally, Carefree and Coleman argue that, even if Paula had this knowledge, Coleman did not know her mother's creditors were seeking to regain the property but merely "thought he had stumbled upon a very good deal." Relying on this, and on the fact that the 1983 sale had been duly recorded, Coleman and Carefree argue that Coleman cannot be deprived of the property because he is shielded by the Louisiana "public records" doctrine. That doctrine, designed to protect the rights of innocent third parties who rely on public title records, is embodied in La.Civ.Code articles 2021 and 2035, which provide that dissolution or nullity, respectively, "of a contract [do] not impair the rights acquired through an onerous contract by a third party in good faith. If the contract involves immovable property, the principles of recordation apply."
 
 
 20
 The district court found, however, that article 2038 of the code, one of the articles governing the revocatory action, controlled this case. Its second paragraph provides in relevant part:
 
 
 21
 An obligee may annul an onerous contract made by the obligor with a person who did not know that the contract would cause or increase the obligor's insolvency, but in that case that person is entitled to recover as much as he gave to the obligor.
 
 
 22
 Accordingly, the district court ordered that the 1985 sale be revoked and Coleman receive the $30,000 he paid.
 
 
 23
 Article 2038, adopted in 1984, replaced, among other provisions, what had been article 1981, which had stated in relevant part:
 
 
 24
 If the contract be onerous, but made in fraud on the part of the debtor, but in good faith on the part of the person with whom he contracted, ... the creditors may annul the contract, and take back the property on paying the price or the value of the consideration with interest, but in this case they shall not receive the fruits.
 
 
 25
 The Louisiana State Law Institute comments on article 2038 note that, with one exception not relevant here, it "reproduces the substance" of article 1981 and other former articles.[16]
 
 
 26
 Article 2038 by its terms governs this case. The Louisiana courts have held that the proper remedy for the creditor, or obligee, in this situation is article 1981,[17] and, we infer, its successor article 2038. Although we find no Louisiana cases directly treating this matter of codal interpretation, we think it plain that articles 2021 and 2035 establish the rights of a good-faith purchaser generally, while article 2038 concerns the specific situation in which the person selling the property to the good-faith purchaser becomes either insolvent or more seriously insolvent as a result and the seller's creditors seek to revoke the sale. In the latter situation, the code balances the rights of the parties by permitting the creditor to revoke the sale but requiring that the good-faith purchaser recover what he paid. The provision more specifically directed to the issue governs, standing as an exception to the general rule.[18] The purchaser is thereby protected, but only to the extent of his investment.
 
 
 27
 Carefree and Coleman's interpretation would render article 2038 virtually without effect as to sales of immovable property, and we reject it. Carefree's reliance on Owen v. Owen[19] is misplaced for the same reason: Owen did not involve a creditor's action to revoke a sale by an insolvent debtor.
 
 
 28
 Coleman did not seek interest on the purchase price either in the bankruptcy court, the district court, or in his brief to us. We therefore express no opinion concerning whether he would be entitled to interest had he sought it.
 
 
 29
 In passing, we note that the trustee did not seek to rescind the sale to Coleman for lesion beyond moiety,[20] and we have no occasion to discuss that doctrine.
 
 
 30
 For the reasons given, we AFFIRM the judgment of the district court.
 
 
 
 [1]
 Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-75, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985)
 
 
 [2]
 Id. at 574-75, 105 S.Ct. at 1512
 
 
 [3]
 Wilson v. Progressive State Bank & Trust Co., 446 So.2d 867, 869 (La.App. 2d Cir.1984)
 
 
 [4]
 Id
 
 
 [5]
 Id
 
 
 [6]
 Id., citing, among other cases, Russell v. Culpepper, 344 So.2d 1372, 1377 (La.1977)
 
 
 [7]
 See Theus, Grisham, Davis & Leigh v. Dedman, 401 So.2d 1231, 1235 (La.App. 2d Cir.1981), citing Herlitz Const. Co. v. Clegg Concrete, Inc., 378 So.2d 1002, 1005 (La.App. 1st Cir.1979)
 
 
 [8]
 Fed.R.Evid. 1101(a), (b)
 
 
 [9]
 See La.Rev.Stat.Ann. Sec. 6:333 A, Comment (a) (1984 revision)
 
 
 [10]
 La.Rev.Stat.Ann. Secs. 15:475-478
 
 
 [11]
 350 So.2d 158, 162 (La.1977)
 
 
 [12]
 Harmon v. Grande Tire Co., 821 F.2d 252, 259 (5th Cir.1987), quoting Galindo v. Precision American Corp., 754 F.2d 1212, 1217 (5th Cir.1985)
 
 
 [13]
 Russell, 344 So.2d at 1376
 
 
 [14]
 Morgan v. Gates, 396 So.2d 1386, 1388 (La.App. 2d Cir.1981)
 
 
 [15]
 Jefferson Bank & Trust Co. v. Fabre, 433 So.2d 877, 878 (La.App. 5th Cir.1983); Redding v. Rupp, 375 So.2d 761, 762 (La.App. 4th Cir.), writ denied, 378 So.2d 437 (La.1979); National Bank of Bossier City v. Hardcastle, 204 So.2d 142, 144 (La.App. 2d Cir.1967)
 
 
 [16]
 La.Civ.Code art. 2038, Comment (a)
 
 
 [17]
 Jefferson Bank & Trust Co., 433 So.2d at 879-80; Morgan, 396 So.2d at 1389-90
 
 
 [18]
 Smith v. Cajun Insulation, Inc., 392 So.2d 398, 402 (La.1980); Bethard v. State, Through Bd. of Trustees, 430 So.2d 1122, 1124 (La.App. 1st Cir.), writ denied, 435 So.2d 430 (La.1983)
 
 
 [19]
 336 So.2d 782, 789 (La.1976)
 
 
 [20]
 La.Civ.Code arts. 2664, 2665